**F I L E D**
**United States Court of Appeals**
**Tenth Circuit**

**NOV 4 2002**

**PATRICK FISHER**
**Clerk**

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

UNITED STATES OF AMERICA,

Plaintiff - Appellee,

v.

ANTONIO J. LOPEZ,

Defendant - Appellant.

No. 01-2067
D.C. No. CR-98-976-BB
(D. New Mexico)

**ORDER AND JUDGMENT**[*]

Before **TACHA**, Chief Circuit Judge, **BRORBY**, Senior Circuit Judge, and **RUSSELL**,[**] District Judge.

Defendant Antonio J. Lopez was charged in three counts of a second superseding indictment with conspiracy to possess with intent to distribute more than 5 kilograms of cocaine, in violation of 21 U.S.C. §§ 846, 841(a)(1) and 841(b)(1)(A) (Count 2); possession with intent to distribute less than 500 grams of cocaine, in violation of 21 U.S.C. § 841(b)(1)(C) (Count 9); and possession with intent to distribute 500 grams or more of

---

[*] This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel. The court generally disfavors the citation of orders and judgments; nevertheless, an order and judgment may be cited under the terms and conditions of 10th Cir. R. 36.3.

[**] The Honorable David Russell, District Judge, United States District Court for the Western District of Oklahoma, sitting by designation.

cocaine (Count 10). Following a jury trial, Defendant was convicted on all three counts and was sentenced to 168 months' imprisonment followed by supervised release of five years on Count 2, three years on Count 9 and four years on Count 10, to run concurrently. Defendant appeals his conviction and sentence, asserting that the district court erred by 1) failing to instruct the jury that it had to find the quantities of drugs charged beyond a reasonable doubt; 2) finding that Defendant negotiated a 5 kilogram transaction, which transaction was also not within jointly undertaken activity and reasonably foreseeable to Defendant or within the intent or capability of the co-conspirators; and 3) sentencing Defendant to more than three years' supervised release on Counts 2 and 10 in light of the first error.

## Apprendi Error

At the close of trial, which preceded the United States Supreme Court's decision in *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), Defendant requested that the district court instruct the jury that it had to find the quantities of cocaine alleged in the indictment beyond a reasonable doubt, based upon the Supreme Court's decision in *Jones v. United States*, 526 U.S. 227, 118 S.Ct. 1405, 140 L.Ed.2d 644 (1999). The court rejected Defendant's request and specifically instructed the jury that the evidence need not establish the quantities of drugs alleged in the indictment. The resulting *Apprendi* error, Defendant argues, is not merely a sentencing error but a trial error of constitutional dimension which is subject to harmless error analysis under *Chapman v. California*, 386 U.S. 18, 24, 87 S.Ct. 824, 17 L.Ed.2d 705, 711 (1967). The error was not harmless, Defendant

2

asserts, because there was no evidence from which the jury could find that the coconspirators possessed with intent to distribute a quantity of cocaine in excess of five kilograms. Had the jury been instructed that they had to find the quantity charged beyond a reasonable doubt, Defendant may well have been acquitted, Defendant asserts.

In *Jones v. United States*, 526 U.S. 227, 119 S.Ct. 1215, 143 L.Ed.2d 311 (1999) and *Apprendi v. New Jersey*, 530 U.S. 466, 120 S.Ct. 2348, 147 L.Ed.2d 435 (2000), the Supreme Court held that due process requires that any fact other than a prior conviction that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury and proved beyond a reasonable doubt. *Apprendi v. New Jersey*, 530 U.S. at ___, 120 S.Ct. at ___, 147 L.Ed.2d at 455 (Fourteenth Amendment; state law offense); *Jones v. United States*, 526 U.S. at 243 n. 6, 119 S.Ct. at ___, 143 L.Ed.2d at 326 n. 6 (Fifth Amendment; federal offense).

Pursuant to 21 U.S.C. § 846, a person who commits the offense of conspiring to possess with intent to distribute cocaine is subject to the penalties for possession with intent to distribute cocaine under 21 U.S.C. § 841(b). The maximum penalty for possessing with intent to distribute any measurable amount of cocaine is twenty years. 21 U.S.C. § 841(b)(1)(C). The jury found the Defendant guilty on Count 2 of conspiring to possess with intent to distribute a measurable amount of cocaine. Defendant Lopez was sentenced to 168 months' imprisonment, which does not exceed the applicable maximum statutory penalty. Accordingly, no *Apprendi* error or violation of due process occurred. *See United States v.*

*Avery*, 295 F.3d 1158, 1192 (10th Cir. 2002); *United States v. Wilson*, 244 F.3d 1208, 1215-16 (10th Cir.), *cert. denied*, 533 U.S. 962, 121 S.Ct. 2619, 150 L.Ed.2d 773 (2001); *United States v. Heckard*, 238 F.3d 1222, 1236 (10th Cir. 2001); *United States v. Thompson*, 237 F.3d 1258, 1262 (10th Cir.), *cert. denied*, 532 U.S. 987, 121 S.Ct. 1637, 149 L.Ed.2d 497 (2001); *United States v. Jones*, 235 F.3d 1231, 1236 (10th Cir. 2000). Alternatively, if, because Defendant was charged in Count 2 with an offense punishable under 21 U.S.C. § 841(b)(1)(A), trial error occurred when the district court refused to instruct the jury that it had to find that the object of the conspiracy was to possess with intent to distribute in excess of 5 kilograms beyond a reasonable doubt, the trial error was cured by the sentence imposed within the maximum statutory penalty for conspiring to possess with intent to distribute any amount of cocaine, which the jury actually found beyond a reasonable doubt.

### Drug Quantity

The district court stated that it was not sentencing Defendant Lopez for quantities not directly attributable to him but that he was "being sentenced for the six-plus kilograms of cocaine that he dealt or agreed to deal." Transcript of Sentencing, Tr. Vol. IX at 728. Defendant asserts that there is no dispute that he was involved in the 2-ounce transaction on September 21, 1995 and the one-kilogram transaction on September 28, 1995. The district court's finding that Defendant negotiated the 5-kilogram transaction is, however, clearly erroneous, Defendant contends. Defendant contends that the record shows that he was not involved in the 5-kilogram negotiation between Ruben Almaraz and Officer Cordova.

4

Recognizing that Defendant could be sentenced based upon the actions of Ruben Almaraz, a co-conspirator, Defendant contends that the 5-kilogram transaction is not attributable to Defendant because, he argues, it was not within the scope of activity Defendant jointly undertook with Ruben Almaraz nor was it reasonably foreseeable to Defendant, as required under U.S.S.G. § 1B1.3. Moreover, Defendant contends that the co-conspirators did not intend to deliver nor were they reasonably capable of delivering such a quantity, as required under U.S.S.G. § 2B1.1, App. Note 12. With respect to the scope of jointly undertaken activity, Defendant observes that the district court made no "particularized findings about the specific agreement . . . [D]efendant joined in relation to the conspiracy as a whole." *United States v. Melton*, 131 F.3d 1400, 1404 (10th Cir. 1997). Had it done so, Defendant maintains, the district court would have concluded that his sentence could not be calculated based on the inclusion of the 5-kilogram negotiation by Ruben Almaraz. Moreover, Defendant contends that the evidence demonstrated that he was no longer a part of the conspiracy as of October 7, 1998. Accordingly, Defendant asserts that his sentence should be vacated, his offense level reduced to 26, based upon at least 500 grams but less than two kilograms of cocaine, and he should be resentenced within a guideline range of 92 to 115 months.

On appeal from a sentence in which drug quantity is at issue, the Court accepts the district court's factual findings unless they are clearly erroneous. *United States v. Cernobyl*, 255 F.3d 1215, 1221 (10th Cir. 2001); *United States v. Hooks*, 65 F.3d 850, 854 (10th Cir. 1995). A finding of fact is clearly erroneous "only if [it] was without factual support in the

5

record or we are left with the definite and firm conviction that a mistake has been made." *Id., quoting United States v. Ryan*, 236 F.3d 1268, 1237 (10th Cir. 2001). The drug amount attributable to a defendant for sentencing purposes in a conspiracy case is not established by looking at the amount of drugs involved in the conspiracy as a whole, but to the quantity of drugs that was both within the scope of the defendant's agreement and reasonably foreseeable to him. *See United States v. Johnston*, 146 F.3d 785, 795 (10th Cir. 1998), *cert. denied*, 525 U.S. 1088, 119 S.Ct. 839, 142 L.Ed.2d 694 (1999); *United States v. Arias-Santos*, 39 F.3d 1070, 1078 (10th Cir .1994), *cert. denied*, 513 U.S. 1175, 115 S.Ct. 1156, 130 L.Ed.2d 1113 (1995). *See also United States v. Melton*, 131 F.3d 1400, 1405 (10th Cir. 1997) ("[R]easonable foreseeability is not by itself sufficient to establish liability for the acts of coconspirators. To be considered as relevant conduct, such acts also must be in furtherance of 'jointly undertaken criminal activity'") (quotation omitted).

In this case, the district court found that Defendant "was involved in that transaction [the sale of 1 kilogram of cocaine on September 28, 1998] and he was also involved in the negotiations and agreement to purchase another five kilograms." Transcript of Sentencing, Tr. Vol. IX at p. 733. The district court's findings are not clearly erroneous but are supported by the record.

The evidence of record reveals the following facts. On September 16, 1998, a confidential informant attempted to reach Jesus Orozco by his pager and, when unable to do so, he went to the El Taco Mexicano restaurant and asked if he could get in touch with

6

Orozco to buy cocaine. Tr. Vol. VI at 235. Carlos Almaraz then called Jesus Orozco ("Chuy") at his home telephone and told him "Pablo," the confidential informant, was there at the restaurant looking for Orozco about some "rims," i.e., cocaine. *Id*.; Ape. App. at 226-28, Exh. No. 47A. A few minutes later Jesus Orozco called Carlos Almaraz at El Taco Mexicano and told Carlos to tell the confidential informant to meet Orozco at the Whataburger restaurant. *Id*. at 236; Ape. App. at 229-30, Exh. No. 48A. The confidential informant met Orozco at the Whataburger and then drove Orozco to another address because Orozco explained he did not have the cocaine on him. Tr. at 236. There, the confidential informant purchased one ounce of cocaine from Orozco. Tr. at 236 & 242. The "ounce" of cocaine was about 4 grams short. Tr. at 242. At this meeting, Orozco gave the confidential source a slip of paper with the names of "Congo" and "Flaco" and a pager number written on it. Tr. at 235-36 & 241-42; Ape. App. at 236, Exh. No. 51. Trial testimony identified Defendant Antonio Lopez as "Flaco" and Carlos Lopez as "Congo." Tr. at 236 & 242.

On September 21, 1998, the confidential informant, along with an undercover police officer, contacted Defendant Antonio Lopez and his brother, Carlos, with the pager number that the informant had received from Jesus Orozco during the September 16 purchase. Tr. at 246. Subsequently, the confidential informant and the undercover officer met with Defendant and his brother and purchased 49.1 grams of cocaine from them for $1,100. *Id*. at 247. The confidential informant and undercover police officer had requested two ounces of cocaine, Ape. App. at 260-61, but the quantity they received was much less. Tr. Vol. VI

7

at 247. During this meeting, the undercover police officer asked if Defendant and his brother could have a "pound" for him in a week, to which Defendant replied "Yes, yes, whenever you want, whatever you want. We are able to get." Ape. App. at 262. The undercover agent asked how much a half-block or pound would cost. *Id.* Defendant replied that it would cost around "$900," because a kilo of cocaine was then selling for $13,000. *Id*; Tr. Vol. VII at 495. At this meeting, the undercover police officer advised Defendant that "Chuy" (Jesus Orozco) had given him a price for "four blocks" and said he wanted to know "if we're still set up for that." *Id*. at 264. Defendant replied that Chuy (Orozco) had given Defendant the business and that since the undercover police officer and Chuy had already agreed on a price, that is how it was going to remain, and that maybe because Chuy was letting the officer have an ounce at $600, Defendant and his brother would let him have it at $550. *Id*. The undercover police officer and confidential informant indicated that was agreeable. *Id*. During this meeting, Defendant gave the undercover police officer and confidential informant a new pager number. *Id*. at 263; Tr. Vol. VII at 495. *See* Ape. App. at 269, Exh. 57. When the undercover police officer told Defendant he would be back the next week for a half-block, Defendant told him to call him on the pager the day before so that he would have everything ready. Ape. App. at 265-66. The undercover police officer asked Defendant if they could discuss the next week what the four kilos were going to cost and Defendant agreed that they would talk. *Id*. at 266.

8

Subsequently, the undercover police officer, Dennis Cordova, attempted to page Defendant and/or his brother on the pager number given to him at the September 21 meeting but did not get an answer or call back. Tr. Vol. VII at p. 496. Officer Cordova then drove to the El Taco Mexicano restaurant on September 28, 1998. *Id.* There he spoke with Carlos Almaraz. Tr. Vol. VII at 496; Ape. App. at 272, Exh. No. 58A. Cordova told Carlos Almaraz that he was looking for Flaco and Congo. *Id.* Cordova advised Carlos that he, Flaco and Congo had agreed the previous week to meet that week for a "block," i.e., a kilogram, *id.*, and that Flaco and Congo had given him a beeper number but were not returning his call. Ape. App. at 272; *see* Tr. Vol. VII at 496-97. Carlos Almaraz inquired if Cordova was related to Flaco and Congo or from where he knew them. Ape. App. at 273-74. He then used Cordova's phone to call Ruben Almaraz. Tr. Vol. VII at 497 & 500. Carlos advised Ruben that some man was looking for them (Flaco and Congo) and asked where they (Flaco and Congo) were. Ape. App. at 274. Carlos told Ruben that the man (Cordova) had already talked to them (Flaco and Congo) and was going to meet them at the restaurant. *Id.* He told Ruben that the man (Cordova) had been paging and paging them (Flaco and Congo) but that they didn't answer. *Id.* at 275. Carlos also told Ruben to stay right where he was at and wait for Carlos there. *Id.* Carlos then asked Cordova at what price Flaco was going to sell Cordova a block. *Id.* at 275. Cordova replied $13,000. *Id.* When Carlos said that was "really cheap," Cordova indicated that that's what Flaco had told him and that Cordova had already talked with Chuy, who had told him the price for a kilo was

$14,000, but that when he met with Flaco, Flaco said "they had gone down in price" to $13,000. *Id*. at 275. Carlos then wanted to know if Cordova had the money and was ready to deal. *Id*. at 276. After Cordova indicated he had the money "stashed," *id*., Carlos told Cordova to return at 2:00 p.m. and they would talk about the price. *Id*. at 277. Carlos also told Cordova to get the money and, when Cordova returned, everything would be ready for him. *Id*. at 277-78. Cordova then left the restaurant at approximately 12:50 p.m. *Id*. at 279.

Undercover Officer Cordova returned to the El Taco Mexicano restaurant later that day and was greeted by Carlos Almaraz as he walked in. Tr. Vol. VII at 504. Ruben Almaraz stood at the back door. *Id*. at 504-05. Carlos asked Cordova if he had the money with him. Ape. App. at 281; Tr. Vol. VII at 505. Cordova said he didn't have it with him but would call his wife to bring it. *Id*. Cordova told Carlos he wanted Carlos to give him a good price the next week, Ape. App. at 281, to which Carlos Almaraz responded: "OK. It's that right now my brother is with those guys, and those guys don't want to let it go at thirteen. They want thirteen-five ($13,5000)." *Id*. Ultimately, Carlos said they would sell Cordova a block or kilo for $13,300 and would agree on that price for the "next one" (next kilo). *Id*. at 282. Carlos then again asked where Cordova met Flaco (Defendant Antonio Lopez). *Id*. at 283. Cordova told Carlos he met Flaco through "Pablo," the confidential informant. *Id*. Carlos inquired as to which "Pablo" that was and when Cordova couldn't remember Pablo's last name, Carlos asked Cordova what Pablo looked like. *Id*. When Carlos asked if Cordova came because of Pablo, Cordova informed Carlos that he had already met Chuy and agreed

to make a deal with Chuy. *Id*. at 284. Carlos asked Cordova if that had been a while and Cordova replied "yes." *Id*. Seemingly satisfied, Carlos then confirmed that they were going to let Cordova have the cocaine that day at that price but that later, when they did more, they'd talk again. *Id*. He also indicated that he would tell Cordova "where and everything." *Id*. Carlos said Cordova would need to call Carlos first before coming next week. *Id*. at 285. Carlos then instructed Cordova to call his wife to bring him the money so they could make the "exchange." *Id*. at 286. Cordova replied that he wanted to "see it." *Id*. Carlos then called someone, implying he was calling Flaco to bring it right away, *id*. at 287, and Cordova called someone saying to bring him $13,300. *Id*. at 288. Carlos said he'd been at the restaurant every day working and that's why he didn't "do much." *Id*. When Cordova inquired what happened with "those guys," obviously meaning Flaco and Congo, Carlos explained that his brother (Ruben Almaraz) and Chuy had had an argument. *Id*. Accordingly to Carlos, Chuy was "doing fine" but they would take cocaine to Chuy and "it would be somewhat short" so they got "some others," i.e., other sellers -- Flaco and Congo -- who were barely starting (in the cocaine selling business) and didn't understand that when somebody calls they should immediately respond. *Id*. When Cordova replied that "they" (Flaco and Congo) treated him very well last week, *id*., Carlos inquired as to whether Cordova had scored a lot. *Id*. at 289. Cordova related that he just bought two ounces from Flaco and Congo and that they cheated him on quantity because the ounces were very light, 5 grams light per ounce. *Id*. Carlos replied "[W]e only give twenty-four or twenty-five (grams per

11

ounce)!" *Id*. at 290. Carlos indicated that he didn't know that Flaco and Congo were not responding to their pagers and that "[i]f . . . [he] had found them, . . . [he] would have let them have it!" *Id*. at 292.

While Carlos and Cordova were waiting for the arrival of the money, Ruben Almaraz asked Cordova if he was a friend of Chuy's. *Id*. Cordova said "yes" and asked where Chuy was. *Id*. at 292-93. Ruben replied that Chuy was in El Paso at the time. *Id*. Ruben wanted to know how Cordova knew Chuy. *Id*. Cordova told Ruben that Cordova and Chuy had reached an agreement about "four or five blocks of soda." *Id*. at 293-94. When Ruben asked if Cordova had bought four from Chuy, Cordova said "no," that Chuy had quoted him a price and they were trying to reach an agreement. *Id*. at 294. At that point in the conversation, Ruben said "Here comes Flaco (Defendant)." *Id*. Cordova asked if they were ready and Ruben replied "yes." *Id*. at 294-95. Thereafter, Cordova gave Ruben, Carlos and Flaco (Defendant) $13,300 and received two half-blocks or 1 kilo of cocaine. Tr. Vol. VII at 508. Cordova was given a new pager number, and told by Ruben to ask for "Frank" when Cordova called that number, which Ruben said was his number. *Id*. at 509-10; Ape. App. at 297-98. When Cordova asked at what price he was "going to let him have it," Ruben indicated it depended on the timing. Ape. App. at 298. Defendant (Flaco) said that was the same reason Defendant had told Cordova to call the day before, *id*., implying that that way Cordova would know what the price was, and Defendant would be prepared and wouldn't

12

have to carry too much. *Id.* Cordova left, with Ruben Almaraz acknowledging that he and Cordova would agree on meeting some place next time. *See id.* at 299.

On October 7, 1998, Cordova paged Ruben Almaraz, Tr. Vol. VII at 514, and subsequently met with him at a service station, after telling Ruben that he wanted to talk to him about "five kilos of coke." *Id.* at 514-15. Ruben arrived in a vehicle that he said belonged to Chuy. *Id.* at 515. In the back seat of the car was the same black bag that Cordova had seen when he purchased a kilogram of cocaine at the El Taco Mexicano restaurant. *Id.* Cordova negotiated with Ruben for the purchase of five kilos of cocaine. Ruben initially said only police ask for five kilos. *Id.* When Cordova replied he could have asked for "eight, nine, fourteen, ten or whatever," Ruben Almaraz appeared reassured, according to Cordova, and said he would sell Cordova five kilograms all on the same day but one kilogram at a time, at forty-five minute intervals, for safety purposes. *Id.* at 515-16. The transaction was never completed, however. On October 15, 1998, Cordova tried to contact Ruben Almaraz by going to the El Taco Mexicano restaurant. *Id.* at 520. Carlos Almaraz was there and when Cordova asked for Ruben, Carlos told Cordova that Ruben had been "caught in Indiana" and was "not available." Ape. App. at 303, Exh. No. 61; Tr. Vol. VII at p. 520; *see id.* at 521. Carlos told Cordova that maybe later on Cordova could stop by, and that in about four weeks, Ruben would probably be there. Ape. App. at 304-05; *see* Tr. Vol. VII at 521. Some time later, Cordova went to the El Taco Mexicano restaurant and spoke to one of Carlos' and Ruben's brothers, Sergio. Tr. Vol. VII at 522. Cordova asked for

13

Carlos or "Frank," which was how Ruben had introduced himself. *Id.* Sergio told Cordova he didn't know what Cordova was talking about and wanted to know what Cordova needed. *Id.* When Cordova told him he, Frank and Carlos had negotiated for some cocaine, Sergio told Cordova he did not know what he was talking about and to get out of there before Sergio called the police. *Id.*

The evidence shows that Jesus Orozco (Chuy) undertook jointly with Carlos and Ruben Almaraz to sell cocaine, including multi-kilo quantities; that Defendant Antonio Lopez agreed with Carlos and Ruben to take over Chuy's role in the drug organization, to honor agreements made by Chuy and sell cocaine on behalf of the Almaraz' brothers, including multi-kilo quantities, subject to their control and direction; and that Ruben Almaraz' agreement on October 7, 1998 to sell Cordova five kilograms of cocaine was reasonably foreseeable to Defendant and was in furtherance of the criminal activity jointly undertaken by Defendant, Carlos Almaraz and Ruben Almaraz.

Contrary to Defendant's argument, there is no evidence in the record that Defendant withdrew from the conspiracy before October 7, 1998. Finally, there is ample evidence in the record that Defendant intended to supply Cordova with multi-kilo quantities of cocaine and that the Almaraz organization, and Defendant through his role therein, was reasonably capable of providing such quantities of cocaine. *See* Tr. Vol. VI at 262-63 & 264-65; Tr. Vol. VII at 439-40, 484, 486, 488-91, 506, 509, 513 & 514-16; Ape. App. Exh. Nos. 27A, 55A & 58A.

14

Although the district court did not make particularized findings about the scope of the specific agreement the Defendant joined in relation to the conspiracy as a whole, his finding that Defendant "was involved in the negotiations and agreement to purchase another five kilograms," Sentencing Transcript, Tr. Vol. IX at 733, clearly indicates that the agreed to sale of five additional kilograms of cocaine to Cordova was within the scope of the specific agreement Defendant joined in relation to the conspiracy and that a five-kilogram transaction was forseeable to him. *Compare with United States v. Baker*, 166 F.3d 348, 1998 WL 808392 at *8-9 (10th Cir. Nov. 20, 1998) (Nos. 97-6311 & 97-6312), *cert. denied*, 526 U.S. 1094, 119 S.Ct. 1512, 143 L.Ed.2d 664 (1999).

**Supervised Release**

Defendant argues that because of the *Apprendi* error, the applicable statute governing the terms of supervised release which could be imposed on Counts 2 and 10 is 21 U.S.C. § 841(b)(1)(C), providing for a minimum 3-year term of supervised release. He further reasons that because § 841(b)(1)(C) is a Class C felony under 18 U.S.C. § 3559(a)(3), pursuant to U.S.S.G. § 5D1.2(a)(2), the maximum term of supervised release which could be imposed for the felonies charged in counts 2 and 10 and of which Defendant was convicted was three years. Accordingly, Defendant argues that the terms of supervised release of five years and four years imposed for his conviction of counts 2 and 10, respectively, violated the sentencing guidelines. Even if the terms imposed do not violate the guidelines, Defendant suggests that the case should be remanded for the district court to determine whether in its

15

discretion the district court would still sentence Defendant to five years on count 2 and four years on count 10, given the mandatory statutory minimum of three years.

Our decision in *United States v. Heckard*, 238 F.3d 1222 (10th Cir. 2001), is dispositive of this issue. "[W]e hold that [21 U.S.C.] § 841(b)(1)(C) is not restricted by U.S.S.G. § 5D1.2(a) or § 3583(b)(2) from establishing terms of release greater than three years." *Id*. at 1237. *See United States v. Thompson*, 237 F.3d at 1262-63; *United States v. Johnson*, 2002 WL 189056 at *2, n. 2 (10th Cir. Feb. 7, 2002) (No. 01-6229); *United States v. Busby*, 2001 WL 744973 at *5 (10th Cir. July 3, 2001) (Nos. 00-5014, -5043, & -5044), *cert. denied*, __ U.S. __, 122 S.Ct. 571, 151 L.Ed.2d 443 (2001). The terms of supervised release on counts 2 and 10 imposed by the district court were authorized by 21 U.S.C. § 841(b)(1)(C), which provides for the imposition of "a term of supervised release of at least 3 years," which statute controls over the sentencing guidelines. *Heckard*, 238 F.3d at 1237, citing U.S.S.G. § 5G1.1 cmt. (1998).

In accordance with the foregoing, Defendant's conviction and sentence are AFFIRMED.

ENTERED FOR THE COURT


DAVID L. RUSSELL
District Judge