

# In The
# Court of Appeals
# Sixth Appellate District of Texas at Texarkana

_____

No. 06-22-00015-CR

_____

ZACHARY SALAZAR, Appellant

V.

THE STATE OF TEXAS, Appellee

On Appeal from the 202nd District Court
Bowie County, Texas
Trial Court No. 21F-088-202

Before Morriss, C.J., Stevens and van Cleef, JJ.
Memorandum Opinion by Justice Stevens

## MEMORANDUM OPINION

Following an automobile collision that resulted in the death of two children, a jury found Zachary Salazar guilty of two counts of capital murder. He was sentenced to life in prison without the possibility of parole on each count, with the sentences to run concurrently. Salazar appeals, maintaining that the trial court reversibly erred (1) when it admitted (a) photographs of the deceased children at the crime scene, (b) photographs of the children's autopsies, and (c) photographs of the survivors' injuries; (2) when it admitted the audio portion of an audio\video recording of the collision; and (3) when it failed to make a finding as to Salazar's age at the time of the offense. Because we find (1) that the admission of the photographs of the children's bodies at the scene was not error, (2) that, even assuming there was error, the admission of the photographs of the children's autopsies and the admission of the audio portion of the recording of the collision was harmless error, and (3) that the trial court did not err when it failed to make a finding of Salazar's age at the time of the offense, we affirm the trial court's judgment.

## I.      Evidence

Salazar's girlfriend, Anola Jordan, lived in Dekalb, Texas, with her mother, Virginia Leal. Salazar and Jordan began a relationship in October 2020. Jordan learned that she was pregnant sometime in January 2021. On the evening of January 13, 2021, Jordan and Salazar "were having a very heated discussion over text message[1] due to living arrangements." After the baby was born, Salazar wanted the couple to live in Texarkana where he was working at the

---

[1] The couple normally communicated through Facebook Messenger and Instagram. For simplicity purposes, we will refer to their mode of communication as "messaging."

time.  Jordan wanted to live in New Boston where she would be close to her family and so that her mother could help with the baby.

The relevant messaging conversation between Salazar and Jordan began at 6:52 p.m. that evening and ended around 9:05 p.m.  Initially, they were having a normal conversation.  But around 8:09 p.m., they began talking about where they would work and live after the baby's arrival.  At that point, the discussion appeared to become heated.  At 8:40 p.m., Jordan messaged Salazar as follows:

> I'm done.  You refuse to change and won't make some compromise for me, you and the future baby we are having.  I will do what I need to make it easier for me and this baby and fighting with you over stuff like this that could be worked on and fixed isn't helping considering it happens more often than not.

About nine minutes later, Salazar sent a text message to her, stating,

> This sh*t is pissing me off way more than it should tbh.  Way f*cking more.  Maybe it's the fact that my family keeps annoying the ever loving f*ck out of me, and maybe it's the fact that my sister keeps barging in and trying to look at my sh*t that doesn't even pertain to her, and then b*tch because my chat is pulled up on my computer screen, maybe it's the fact that I busted my f*cking a*s at work all day.  I don't f*cking know.  But god-da*nit, if this night gets any f*cking worse than it already is I'm probably gonna end up killing someone, or killing myself.  One of the f*cking two.

After receiving seven more messages from Salazar within a six-minute period, Jordan responded, "I told you I was done Zach.  You can be in the baby's life and I don't expect you to provide anything for either of us."  The last message from Salazar, which occurred at around 9:05 p.m., stated, "Then do us both a favor, and block me.  Don't come back."  Jordan complied with his request.  According to Leal, Jordan showed her a message from Salazar that said he was

3

going to kill himself or kill somebody else. As a result, Leal told Jordan that she did not think it was a good idea for Jordan to be in a relationship with Salazar.

Around 9:50 p.m., Salazar showed up at Leal's home and asked Jordan to go outside with him so that they could talk. Leal would not allow Jordan to go outside with Salazar by herself, so she accompanied her. Immediately, Salazar began arguing with Jordan about where they would live after the baby's birth. Leal said that Salazar did not appear to be impaired by alcohol or drugs. Yet, she said, "[Salazar] was aggravated, agitated raising his voice. He was cussing. You could see the anger. It was aggressive." When asked if she was concerned about Salazar's behavior toward her daughter, Leal stated, "Pregnant or not, I would have not let her [be] with him under those circumstances. He was not okay." Realizing that Salazar was not going to change his behavior, Leal told him to leave her home. At that point, "[Salazar] jump[ed] off the porch, mumble[d] something." Leal said, "I asked him what, and then he -- it's bad. He said, f*ck it, I'm going to go wreck." Salazar returned to his truck, pulled out, kicking up dirt, "and then spun out on the road."

Leal said that she and Jordan went back inside the house and that, within a few minutes, they heard sirens down the road. Leal immediately thought that Salazar had acted on his threat "to go wreck." After hearing the sirens, Leal and Jordan drove to nearby Highway 82, where they were re-routed to another street. Within moments, they saw Salazar's red truck. They immediately made themselves known to the first responders, telling them "that [Salazar] had stated that he intended to wreck the vehicle." Jordan also showed a police officer the text messages she had received from Salazar before the collision.

4

Jordan testified that, after she received the message from Salazar about him killing himself or someone else, she became concerned. Yet, she said that she stopped responding to his messages "[b]ecause there [was] no in between with him." She continued, "He will say what he wants to say with no remorse no matter what anyone else has to say about it, whether it's logical or not."

According to Jordan, when Salazar arrived at her house, "[h]e was very tense, and then as the conversation progressed, he started to get louder and more verbally aggressive, and he was slowly inching forward."[2] Jordan said that, after her mother told Salazar to leave, he "very clearly [said] f*ck it, I'll just go wreck." Jordan explained that she did not "take it to heart because [she] didn't think he would do it. [She] just figured it was an in the heat of the moment thing because he had gotten so angry." She also testified that it would take about two to three minutes to travel from her home to the scene of the collision "between the lights."

After Salazar left, Jordan messaged her father to tell him that she had broken up with Salazar and that he had unexpectedly come to her house in Dekalb. At 9:56 p.m., she explained to him that her mother had made Salazar leave and that he left "threatening to wreck."[3] At 10:55 p.m., Jordan informed her father that Salazar had been involved in a wreck and that "his truck [was] burnt to the ground." She then explained that Salazar was being airlifted to a hospital.

---

[2]Despite his aggressive behavior, Jordan said that Salazar had never been violent toward her.

[3]The jury heard that, at 9:56 p.m., people began reporting a major collision on Highway 82.

5

Jordan also testified that, other than ADHD or ADD, she was unaware of Salazar having any health or medical issues. She explained, however, that he had previously attempted suicide by ingesting pills. According to her, Salazar had just broken up with his girlfriend at the time. Later, Jordan stated that Salazar had been physically ill around January 8, 2021. "He was getting a stuffy nose. He was clammy, possibly dehydrated, and then his parents had also come down with Corona as well." On January 10, Salazar messaged Jordan to tell her that he did not want to go to work because he was "fatigued ASF." On January 11, Salazar messaged her to tell her that he was ready to get off work because he did not feel well.

Although Jordan initially stated that there had been nothing wrong with Salazar's vehicle, she later recalled that they had messaged one another about the truck having a vibration that needed to be fixed. She also remembered that Salazar had told her around January 2, 2021, that he was "having air in the lines [of his truck], about power steering issues that he was having, [and] need[ing] to go to Wal-Mart to get power steering fluid." Later the same day, there had also been a discussion between the couple about the truck needing a new power steering pump. In addition, they talked about Salazar's truck needing new wheel bearings. She explained that, when a vehicle's wheel bearings were not working, the vehicle "doesn't move. You can't drive the [vehicle] without it causing problems or being at an angle. So you'll be driving funny, and it will cause wear on the tires."[4]

Around 9:50 p.m., on the evening of the wreck, Jason Reynolds was in the process of driving to the Sonic in Dekalb. Just before he arrived, he noticed a red Ford Ranger traveling

---

[4]Salazar testified that his truck had been having some mechanical problems prior to the wreck but that he did not believe the truck malfunctioned immediately before the wreck occurred.

toward him.  Regarding the red truck, he testified, "[T]hey weren't staying in their line -- their lane.  They were drifting over towards the middle of traffic."  Reynolds said that he "zipped over to the shoulder and pulled in the Sonic."  As soon as he pulled into the first or second stall, Reynolds heard "a loud boom."  He immediately turned around and saw "debris and lights kind of flashing around.  It was just chaos and dust."  According to Reynolds, he never saw the driver of the red Ford Ranger take evasive action to avoid the collision.

Reynolds immediately went to check on the passengers in a mini-van that had been involved in the wreck.  He said that, when he got to the vehicle, it "looked like somebody had taken a can opener and just peeled the whole side of the van back, and there were two babies like hanging there in baby car seats."  A few seconds later, Reynolds saw one of the passengers from the mini-van run around the back of the vehicle screaming.[5]  All he could hear "was [someone] screaming the names of other people, and then everything else was just dead quiet."  Reynolds stated that, at the time of the wreck, he believed that it was an accident, but at trial, he testified, "Now, I'm not sure."

Joann Rainer, who is James Rainer's mother, testified that, on the evening of the wreck, the family had made a trip to the grocery store in their mini-van.  Joann described the family's seating arrangements in the vehicle as follows:

---

[5]James Rainer was the driver of the mini-van.  It was later determined that it had been James's wife, Ashley, who ran around the back of the vehicle screaming.

**FRONT OF VAN**

| | | |
|---|---|---|
| James Rainer (husband/father) | | Joann Rainer (James's mother) |
| J.C. (three-year-old) | Baby J.R. | Ashley Rainer (wife/mother) |
| R.B. (seven-year-old) | | E.T. (five-year-old) |

**BACK OF VAN**

After leaving the grocery store, they made a stop at Wendy's to get the children some food and then got back on the road. Shortly after that, James pulled into a gasoline station parking lot so that he could help the children with their food. According to Joann, James had been driving the speed limit "and everything was going fine." Joann said that, not long after they left the gas station, she saw a vehicle driving "just straight at [them]." After the wreck occurred, Joann told the police at the scene that she felt like the person driving the other vehicle "was trying to kill [them] because of the way he done it." On cross-examination, Joann conceded that she did not know if Salazar's truck had any steering or braking issues or whether Salazar had any physical or mental ailments at the time of the wreck.

Texas Department of Public Safety (DPS) Trooper Jonathan Baldwin testified that he had been trained in crash investigations, which included, among other things, understanding basic speed formulas, photographing evidence, "and operating the Total Station and the Vericom, which are instruments [DPS] use[s] to map [vehicular] fatalities." The troopers who specialize in those types of investigations are referred to as "crash teams."

8

On the evening of January 14, 2021, Baldwin was asked to investigate what he referred to as "a crash reconstruction." Baldwin explained, "What that is, is usually where we go, and we are going to take the crash and not only put the vehicles back together, but answer all reasonable questions." Baldwin said he determines the speed of a vehicle, the origins of the vehicles, and whether there were any vehicle defects that may have contributed to the crash. The day after the crash, Baldwin took photographs of the area in which the wreck occurred. Without objection, those photographs were admitted into evidence and published to the jury.

Baldwin testified about his extensive investigation. And, contrary to Salazar's statement to his mother during a jail telephone call that he had slammed on his brakes at the time of the wreck, Baldwin stated that, based on his investigation, that did not happen. He explained,

> And the path of travel, we've heard two different witnesses talking about him leaving his lane and traveling from Sonic, which we've already seen is a pretty significant distance on here. There is plenty of time in that amount of time to register you're coming out of your lane, and so when we're looking for evasive action, a lot of times when there's mechanical defect, we see it all the time, if you blow a tire, a lot of times that vehicle is going to veer. So you're going to begin over-correcting, something similar to that. If you feel like you [sic] power -- we've talked about power steering earlier. If your power steering is off when you're driving that vehicle, it is going to be hard to maneuver that, but you can still use your brakes. If your brakes go out, your steering is still a viable option. If your steering goes out, your brakes are normally a viable option. There's horn. You know, we have horns for that exact reason. These are all ways to indicate or to maneuver out of a situation like this. According to the witness statements we have, none of this was present.

During Baldwin's testimony, the State offered, and the trial court admitted, a copy of an audio/video recording that had been taken from a convenience store's outdoor security camera the evening of the crash. The store appeared to be located about a block away from where the wreck had occurred. Salazar objected to the admission of the video, but his objection was

9

overruled by the trial court.[6]  In that particular recording, the jurors heard what sounded like a violent collision between Salazar's truck and the Rainers' mini-van.  They then saw a ball of fire and clearly heard at least one child or a woman repeatedly screaming.  They also clearly heard repeated screams coming from a male passenger.  During almost the entirety of the video, which was no more than ten seconds, the jurors could hear a horn continuously blaring.

Baldwin said that the recording showed the path of the pickup truck after it collided with the minivan.  According to Baldwin, it put in perspective how fast the pick-up truck was moving.  The recording also showed sparks on the pavement that Baldwin referred to as "gouge marks, which are indentations in the pavement."  Further, Baldwin said it showed "that when [Salazar's] vehicle [came] to a stop as it[ was] rolling, it[ was] already going to be in flame."

Dr. Stephen Hastings, a Dallas County medical examiner, performed J.C.'s and R.B.'s autopsies.  In addition to his testimony at trial, the State offered, and the trial court admitted, Hastings' written autopsy reports describing the children's injuries.  In regard to J.C., Hastings described, among other things, "a gapping 6-1/4 inch full-thickness abraded laceration" to his scalp and that "[t]he underlying bone ha[d] extensive comminuted fractures and the cranial vault [was] externally visible."  According to Hastings, J.C.'s neck and head were badly bruised and lacerated.  His liver had been lacerated on the right side, and his pancreas, bladder, and thymus showed evidence of hemorrhaging.  There were contusions involving J.C.'s lungs and heart.  In addition, his left clavicle was "fractured laterally" and his "pelvis ha[d] an open book fracture." J.C.'s fingers, arms, and legs were bruised and abraded, and his left femur had been fractured.

---

[6]The State was allowed to replay the recording shortly after the jury saw and heard it for the first time.  Again, Salazar objected.  His objection was overruled.

Hastings concluded that J.C. died as a result of blunt force injuries. The manner of his death was "[h]omicide."

In regard to R.B., Hastings found, among other things, that his skull had been fractured in multiple places and that there was damage to his left eye and upper eyelid. R.B.'s head and neck were bruised and abraded. Hastings found blood in R.B.'s right external ear canal and bleeding in his brain. His body was bruised and had multiple abrasions. R.B.'s pelvis had been fractured, and there was a contusion of the left atrium of his heart. R.B.'s arms and legs were badly cut and bruised in several places, and his right and left femurs were fractured. There were contusions of the brain, heart, and right and left lungs. Hastings concluded that R.B. died as a result of blunt force injuries. The manner of his death was "[h]omicide."

Twenty-two-year-old Salazar[7] testified that he did not intentionally or knowingly cause the deaths of the children, but he conceded that the messages he had written might make it appear that he had gone "and [done] it." Salazar said that the reason he wrote the messages was because Jordan said that she was leaving him, that he was angry and frustrated, and that he was venting and attempting to manipulate her. When he was asked why he would state something like that in writing, he said, "Because I'm just really, really morbid, and I tried to make it seem legitimate." Salazar stated that he was "not at all" suicidal or homicidal in January 2021 and that he had no desire to cause anybody's death.[8] According to Salazar, he was not a violent person, explaining, "Angry, yes; violent, no."

---

[7]At the time of the incident, Salazar was twenty-one years old.

[8]Although he did not admit that he had ever attempted suicide, Salazar conceded that he had previously taken 15,000 milligrams of Tylenol. At that time, Salazar had been fighting with his family and he "just had a whole slough [sic]

Salazar explained that he had been punishing himself "mentally" because he felt "horrible" about the incident and he could not "take back what happened." Salazar said he wanted to apologize for the wreck but that he was not apologizing for intentionally or knowingly killing the children. Instead, Salazar claimed that he "suspect[ed]" that he had had a seizure at the time the incident occurred but that he was not certain if that is what had happened. Salazar also explained that on the day of the wreck he had been having "little blackouts and feeling [his] brain twitch and things of that sort, which [he had] come to find out were seizures, and they can happen as a direct result of stress, both physical and external."

Salazar stated that previously he had wrecked a truck at work. At the time, he blamed his actions on being tired and failing to pay attention. But, in hindsight, he believed that he actually had what he referred to as "little blips." Salazar explained that, during those "little blips," he would become confused and be unsure of what was going on. He claimed that he had suffered from those types of issues all of his life but just never realized that they had been seizures. Salazar claimed that he had suffered from several "blips" prior to leaving his house the night of the accident, explaining, "I remember having felt what I've come to learn is called an aura, which is where you're going to have a really bad seizure, and you get this overwhelming feeling of nervousness, of something wrong, something's wrong, something is very wrong."[9] Salazar

of things going on, and [he] was just bad off, and [he] made a stupid decision, on an impulse decision." He was eventually found unconscious in the bathroom at work, and he was taken to the hospital to have his stomach pumped. Salazar promised that he would never do something like that again because he did not want to upset his family a second time.

[9]Specifically, Salazar stated,

continued, "You don't know what, you just know something's wrong." In addition, Salazar had been positive for COVID-19 at the time of the incident, which, according to the research his mother had done, could have caused him to have a seizure.

As a result of the wreck, Salazar suffered a skull fracture, brain hemorrhaging, and some memory loss. He said that he still did not remember "bits and pieces here and there" about the crash. In addition, Salazar said that, when he was four years old, he had been diagnosed with ADHD and bipolar disorder.

Salazar also said that, while he was in jail awaiting trial, he had suffered several seizures and that he had been prescribed medicine to minimize their occurrences.[10] According to Salazar, the medicine caused him to be extremely aggressive, agitated, and irritable.

The State offered, and the trial court admitted, several recordings of telephone calls between Salazar and his parents while he was in jail. At times, during those conversations, Salazar sounded very agitated. In one of the recordings, Salazar can be heard telling his father, "I'm trying very, very hard . . . because I know that tomorrow I'm gonna have to put a rein on it. And that's all I'm going to say. Because I was so, so close." His father attempted to interrupt Salazar, but he continued to talk. His father then demanded, "No more, no more. Are we understood?"

---

I feel -- it seems to appear in different portions of my brain. A lot of times, it's on the left right here and in the back, and those two are the ones where it like, while, I know my eyes are open, I completely lose sight for all of a split second, and then tinnitus in my ear rings really loud, and it hurts when it does it.

[10]Salazar explained that he had been prescribed 3,000 milligrams of Keppra, which he was told to take twice a day. Salazar said it was given to him to minimize his seizures, but he thought that he "need[ed] to be on stronger medication."

Later, in the same conversation, Salazar asked his father if he "[could] vent on something," to which his father told him that he was not to talk about anything "that [was] going on [then]." Ignoring his father's plea, Salazar then informed him that he wanted to discuss his seizures and stated, "How can people, a.k.a., Bowie County think that I'm faking these f*cking seizures?" Salazar's father again told him to "stop it," but Salazar did not comply. Salazar asked his father whether he saw him jerk his "head to the left like [he] seen something" when he was in the courtroom, and his father told him that he had not. Salazar said, "Well, you shoulda cause I couldn't tell or not, but it looked like the f*cking lights flickered [inaudible], but I couldn't f*cking tell." Salazar continued, stating, "This sh*t has been going on a really f*cking long time . . . and something was not right." He then claimed that, while he was in jail, "[he had been] blacking out at least once a day." Salazar's father told him that "[they—the parents—] wouldn't have known [about the seizures]."

Next, Salazar began talking about "these gruesome-a*s pictures[,]" at which point Salazar's father told him that, if Salazar did not stop talking about the wreck, he "was going to hang up." Despite his father's various warnings, Salazar said, "Because that's something I really wanna f*cking rant on." Eventually, Salazar agreed that he needed to stop talking, but then immediately said, "I know, I know, and that's the same exact sh*t that got me here in the first place." A minute or two later, Salazar began talking about Jordan in a derogatory fashion, stating that he "would be lying to [his father] if [he] said he didn't want to slap her[.]" At that point, his father raised his voice and said, "Zachary, what did I say?" Despite his father's

14

persistent pleas, Salazar continued to rant. After what turned out to be a final warning from his father, Salazar began talking about more mundane matters.

On another occasion, Salazar can be heard having a telephone conversation with his mother, Teresa. Referring to the text message he had written to Jordan that said he was "probably gonna end up killing someone, or killing [him]self," Salazar stated, "There's not one motherf*cker on this planet that ain't said sh*t they didn't mean." Teresa agreed, stating, "Everyone has." Then she said, "You just happen to be the unlucky one that it actually f*cking happened."

On another day, Teresa and Salazar discussed Salazar's complained-of seizure just before he crashed into the Rainers' van. Salazar said that his first thought was to "slam that brake as hard as [he] could." After explaining that "hindsight is 20/20," Teresa said, "Because if there was a possibility that if you would have turned right, you would have hit somebody else or somebody else would have hit you." Salazar responded, "[N]ot down, not down that road." He continued, "The way that I remember it being, over to the right there was not sh*t else . . . . Over to the right in that area it's just grass and dirt." "Yeah, there's buildings, but they are way out over yonder, yeah, but there's buildings but they're way out over yonder."

An e-mail written by Salazar on October 23, 2020, was also admitted into evidence, and stated,

> Yanno, get f*cked over my whole life. Bullied all throughout highschool [sic], and now even my job. I got assaulted by my supervisor, (yes I fought back) and got moved to vacuuming so now I'm not even making tips. On top of that, wanna know what I've gotten for having cheated on Ally? I got payback for it with this girl I started falling for afterwords. (Because I didn't feel like I deserved Ally after that. She deserves better. So I cut myself out of her life entirely.). I've been

15

breaking down regularly at work. I'm mentally in a pretty bad place. I've almost intentionally gotten into multiple wrecks. I can't tell you how many times I've been going 80+ and damn near went into the opposing lane just to get this shit done and over with and die. I won't mention the other shit. And what??? Ty's dead??? Why did . . . What????"[11]

As a result of the collision, J.C. and R.B. were killed. E.T. had, among other injuries, a broken leg and a broken elbow. The left side of James's upper arm and the left and right sides of his face were badly scraped and severely cut, requiring several stitches.

## II.    Discussion

### A.    Salazar's Rule 403 Objections to Various Photographs and the Audio Portion of the Recording of the Collision

In his first, second, and third points of error, Salazar contends that the trial court erred when it admitted certain photographs into evidence, and, in his fourth point of error, he argues that the admission of the audio portion of the recording of the collision was error. Salazar maintains that the admission of the photographs and the audio portion of the recording violated Rule 403 of the Texas Rules of Evidence, arguing that the evidence was more prejudicial than probative.

#### 1.    Standard of Review and Applicable Law

"The admissibility of a photograph [or a recording is] within the sound discretion of the trial judge." *Shuffield v. State*, 189 S.W.3d 782, 786 (Tex. Crim. App. 2006). The decision to admit or exclude evidence will not be overturned on appeal absent a showing that the trial court abused its discretion. *Id.* at 787. Our rules of evidence favor the admission of all relevant evidence at trial, though these evidentiary rules do provide exceptions that would exclude

---

[11]Salazar testified that he had not been suicidal in October 2020.

16

otherwise relevant and admissible evidence.  *See* TEX. R. EVID. 401.  Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence.  TEX. R. EVID. 403; *Williams v. State*, 301 S.W.3d 675, 690 (Tex. Crim. App. 2009).

Rule 403 "creates a presumption of admissibility of all relevant evidence and authorizes a trial judge to exclude such evidence only when there is a 'clear disparity between the degree of prejudice of the offered evidence and its probative value.'" *Mozon v. State*, 991 S.W.2d 841, 847 (Tex. Crim. App. 1999).  Evidence will be considered "unfairly prejudicial" only when it has an undue tendency to suggest that a decision be made on an improper basis, commonly an emotional one. *Id.* n.7 (citing *Montgomery v. State*, 810 SW.2d 372, 389 (Tex. Crim. App. 1990) (op. on reh'g).  When an appellant challenges the propriety of the trial court's admission of evidence over a Rule 403 objection, an appellate court should consider a number of factors, including:

(1)     how probative the evidence is;

(2)     the potential of the evidence to impress the jury in some irrational, but nevertheless indelible way;

(3)     the time the proponent needs to develop the evidence;

(4)     the proponent's need for the evidence; and

(5)     the likelihood that presentation of the evidence will consume an inordinate amount of time or merely repeat evidence already admitted.

*Giglioblanco v. State*, 210 S.W.3d 637, 641–42 (Tex. Crim. App. 2006).  The reviewing court, using an abuse-of-discretion standard, should "do more than decide whether the trial judge did in fact conduct the required balancing between probative and prejudicial values; 'the trial court's determination must be reasonable in view of all relevant facts.'"  *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997) (quoting *Rachal v. State*, 917 S.W.2d 799, 808 (Tex. Crim. App. 1996) (plurality op.)).

### 2. The Trial Court Did Not Err When It Admitted Photographs of the Children's Bodies at the Scene and Photographs of the Survivors' Injuries

In his first point of error, Salazar complains that the trial court abused its discretion when it admitted State's exhibits 13, 14, 17, 18, 19, 20, 21, and 22, which were photographs taken at the scene showing the corpses of the children still in the wreckage, and State's exhibits 23 and 24, which were photographs of one of the deceased children at the scene on top of a body bag.

Further, in his third point of error, Salazar contends that the trial court erred when it admitted State's exhibits 54 through 64, which were photographs of the survivors' injuries that were taken after they had been treated and released from the hospital.  Exhibits 54 and 55 are photographs of Joann's bruised leg and her badly bruised abdominal area.  State's exhibits 58 through 64 are photographs of James's injuries, which included, among other things, facial injuries and broken bones.  Salazar contends that he did not dispute either the children's deaths or the survivors' injuries and that their deaths and injuries were firmly established in the record by other evidence.  Consequently, he argues, the admission of the photographs violated Rule 403 of the Texas Rules of Evidence.

18

"A court may consider many factors in determining whether the probative value of photographs is substantially outweighed by the danger of unfair prejudice." *Williams*, 301 S.W.3d at 690. Specifically, the trial court should consider, among others, the following factors: (1) the number of photographs, (2) the size of the photograph, (3) whether it is in color or black and white, (4) the detail shown in the photograph, (5) whether the photograph is gruesome, (6) whether the body is naked or clothed, and (7) whether the body has been altered since the crime in some way that might enhance the gruesomeness of the photograph to the appellants detriment. *Id.*; *see also Narvaiz v. State*, 840 S.W.2d 415, 429 (Tex. Crim. App. 1992).

Here, the photographs taken at the scene were color photographs. The children appearing in the photographs were completely clothed. The photographs did not appear to have been taken at an unusually close range nor did they appear to be enlarged. They were reasonably limited in quantity, and they were no more gruesome than what the responding officers and emergency personnel found when they arrived at the scene. "Although a crime scene may be gruesome, 'that fact alone will not [necessarily] render the probative value of [photographic] exhibits [of the crime scene] substantially outweighed by any prejudicial effect.'" *Narvaiz*, 840 S.W.2d at 430 (alterations in original) (quoting *Long v. State*, 823 S.W.2d 259, 273 (Tex. Crim. App. 1991)); *see also Williams*, 301 S.W.3d at 692. Further, the photographs were not altered in any manner that might have enhanced their gruesomeness. The same is true of the photographs of the surviving victims that were taken not long after the wreck occurred. In sum, the photographs were probative of the crime scene and the injuries sustained by all of the victims. The State warned the jurors that some of the evidence it intended to present at trial would be especially

19

graphic, but, while we have no doubt that it was difficult for the jurors to see, we cannot say that State's exhibits 13, 14, 17, 18, 19, 20, 21, 22, 23, 24, 54, 55, 56, 57, 58, 59, 60, 61, 62, 63, or 64 were more prejudicial than probative. As a result, we do not find that the trial court abused its discretion in admitting those photographs.

We, therefore, overrule Salazar's first and third points of error.

### 3. Any Error in the Admission of the Photographs of the Children's Bodies After They Were Removed from the Scene or the Audio Portion of the Recording of the Collision Was Harmless

In his second point of error, Salazar complains of the admission of State's exhibits 40 and 41,[12] and State's exhibits 94 and 95,[13] which were photographs taken of R.B. and J.C. after they had been removed from the scene or during their autopsies (autopsy photographs). In his fourth point of error, Salazar contends that the trial court erred when it admitted the audio portion of an audio/video recording of the collision. As to all of those exhibits, Salazar argues that their probative evidentiary value was outweighed by their prejudicial effect and that the admission of the evidence caused him harm.

---

[12]More specifically, State's exhibit 40 is a color, close-up photograph of three-year-old J.C. after he had been removed from the scene and placed on what appears to be a body bag. The photograph shows in great detail the extensive wounds to his head. J.C.'s skull had been severely crushed. Portions of his skin, brain, and bone were dislodged from his skull.

State's exhibit 41 is a color, extremely close-up photograph of J.C.'s brain after it appeared to have been removed from his skull. With the exception of a few inches of white background on an 8 x 10-inch area, the entire photograph shows a bright-red, glossy organ, with darker red areas dispersed throughout. Pieces of J.C.'s hair are visible as well.

[13]State's exhibit 94 is a color, close-up photograph of seven-year-old R.B.'s face, which shows substantial bruising and injuries around his hairline, his left eye, and his jaw.

State's exhibit 95 is a color, relatively close-up photograph of R.B.'s nude body lying supine and shows severe injuries to the side of his face, head, mouth, and ear and bruising and cuts to his arms, mid-section, groin area, legs, ankles, and feet. The photograph also shows an extensive amount of thick stitching in a circular pattern around the area of his heart, which indicated that the organ had been harvested for donation. What appears to be a toe-tag is attached to his right foot.

20

Even assuming, without finding, that the trial court erred when it admitted the children's autopsy photographs and the audio portion of the recording of the collision,[14] the State's use of the complained-of exhibits did not affect Salazar's substantial rights. To determine whether erroneous admission of evidence amounts to reversible error, we look to Rule 44.2(b) of the Texas Rules of Appellate Procedure, governing non-constitutional error in criminal cases. *See* TEX. R. APP. P. 44.2(b). Neither appellant nor the State bears "the burden to demonstrate whether appellant was harmed by the trial court's error." *See Johnson v. State*, 43 S.W.3d 1, 5 (Tex. Crim. App. 2001). Rather, it is this Court's responsibility to assess, from the context of the error, whether the judgment requires reversal because the error affected appellant's substantial rights. *See id.* "A substantial right is affected when the error had a substantial and injurious effect or influence on the jury's verdict." *King v. State*, 953 S.W.2d 266, 271 (Tex. Crim. App. 1997) (citing *Kotteakos v. United States*, 328 U.S. 750, 776 (1946)). In making this determination, we review the record as a whole. *Kotteakos v. United States*, 328 U.S. 750, 764–65 (1946). While we may consider whether there was overwhelming evidence of Salazar's guilt, we are to consider the erroneous admission of the photographs and the audio portion of the recording of the collision in the context of the entire record. *See Motilla v. State*, 78 S.W.3d 352, 358 (Tex. Crim. App. 2002).

Despite the gruesomeness of the children's autopsy photographs and the harrowing sounds heard in the audio portion of the recording, the jury had already learned of the exceptionally disconcerting circumstances surrounding the children's deaths through various

---

[14]We find no error in the trial court's admission of the video portion of the recording.

21

witnesses, including testimony that a transport person "broke down emotionally" and that a county official "became [so] overwhelmed" that another official had to be called to the scene. Dr. Hastings, who performed the autopsies, testified in detail about the severity of the injuries suffered by the children as a result of the collision.[15]  In addition, the crime scene photographs, which were properly admitted, revealed the extent of the children's catastrophic injuries and their tragic results.  Likewise, the photographs and the recording had little, if anything, to do with a disputed issue at trial, which, for the most part, centered around the question of Salazar's intent. And, while Salazar claims that he presented a substantial amount of evidence to support his position that a seizure caused him to crash into the Rainers' van, the State presented not only oral testimony that he intentionally caused the wreck, but also Salazar's own written text message to Jordan, which clearly stated that he was "going to kill someone or kill himself" if his evening did not get better.  While Salazar argued that we all say things we do not mean, just minutes after sending his incriminatory text message to Jordan, he succeeded in accomplishing exactly what he had threatened.  Moreover, just a few months prior to the wreck, Salazar had stated in an email, "I can't tell you how many times I've been going 80+ and damn near went into the opposing lane just to get this sh*t done and over with and die."  As it related to the main issue at trial, Salazar's own words were extremely detrimental to his defense.  Lastly, in this three-day trial, which involved the presentation of over twenty-five witnesses, the State did not over-emphasize either the autopsy photographs or the audio portion of the recording during trial or during its opening or closing arguments.  After examining the entire record, we have a fair assurance that the admitted

---

[15]The trial court admitted the children's autopsy photographs during Hastings' testimony.

photographs and audio portion of the recording did not influence the jury or that it influenced the jury only slightly in assessing Salazar's guilt.

Accordingly, we overrule Salazar's second and fourth points of error.

**B.      The Trial Court's Imposition of Two Life Sentences Without the Possibility of Parole Did Not Violate the United States Constitution**

Section 12.31(b) of the Texas Penal Code provides:

> (b)      . . . . In a capital felony trial in which the state does not seek the death penalty, prospective jurors shall be informed that the state is not seeking the death penalty and that:[16]
>
> > (1)      a sentence of life imprisonment is mandatory *on conviction of capital felony,* if the individual committed the offense when younger than 18 years of age; or
> >
> > (2)      a sentence of life imprisonment without parole is mandatory *on conviction of the capital felony*, if the individual committed the offense when 18 years of age or older.

TEX. PENAL CODE. ANN. § 12.31.  The statute sets out the maximum punishment for a capital offense, and it is based on a defendant's age.

Salazar contends that, before he could be sentenced to life without parole, the jury was required to make a fact-finding, beyond a reasonable doubt, that he was at least eighteen years old at the time of the offense.  Because the jury made no such finding, Salazar maintains, the statutory maximum in his case was a life sentence with the possibility of parole.

In support of his argument, Salazar directs us to *Apprendi v. New Jersey*, 530 U.S. 466, 469 (2000).  In *Apprendi*, the United States Supreme Court held that "the Due Process Clause of the Fourteenth Amendment requires that a factual determination authorizing an increase in the

---

[16]The State did not seek the death penalty in this case.

23

maximum prison sentence for an offense from 10 to 20 years be made by a jury on the basis of proof beyond a reasonable doubt." *Id.* In that case, the "grand jury returned a 23-count indictment charging Apprendi" with offenses arising out of his actions in "fir[ing] several .22-caliber bullets into the home of an African-American family that had recently moved into a previously all-white neighborhood." *Id.*

As a part of a plea agreement, Apprendi pled guilty to "two counts (3 and 18) of second-degree possession of a firearm for an unlawful purpose, and one count (22) of the third-degree offense of unlawful possession of an antipersonnel bomb" and went before the trial court, non-jury, to decide punishment. *Id.* at 469–70 (citation omitted). At sentencing, the State requested that "the court . . . impose a higher 'enhanced' sentence on count 18 . . . on the ground that that offense was committed with a biased purpose" as provided by a state "hate crime" law. *Id.* at 470. "The judge . . . concluded that the evidence supported a finding 'that the crime was motivated by racial bias,'" "found 'by a preponderance of the evidence' that Apprendi's actions were taken 'with a purpose to intimidate,'" and "sentenced him to a 12-year term of imprisonment on count 18." *Id.* at 471.

"Apprendi appealed, arguing, *inter alia*, that the Due Process Clause of the United States Constitution requires that the finding of bias upon which his hate crime sentence was based must be proved to a jury beyond a reasonable doubt." *Id.* (citing *In re Winship*, 397 U.S. 358 (1970)). The United States Supreme Court explained,

> Other than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt. With that exception, we endorse the statement of the rule set forth in the concurring opinions in that case: "[I]t is

24

unconstitutional for a legislature to remove from the jury the assessment of facts that increase the prescribed range of penalties to which a criminal defendant is exposed. It is equally clear that such facts must be established by proof beyond a reasonable doubt."

*Id.* at 490 (citing *Jones v. State*, 526 U.S. 227, 252–53 (1999)).[17] Accordingly, the United States Supreme Court reversed Apprendi's sentence and remanded the case to the trial court. *Id.* at 497

Here, Salazar maintains that, instead of the jury making the determination of his age, the trial court "implicitly concluded" that he was eighteen at the time of the offense. According to Salazar, "[t]hat factual determination by the trial court violated the Supreme Court's holding in *Apprendi*." Contrary to Salazar's contention, we do not find *Apprendi* to be compelling under the facts of this case.

In *Franklin v. State*, Franklin was charged with capital murder and, as is the case here, the State did not seek the death penalty as punishment. *Franklin v. State*, 579 S.W.3d 382, 384 (Tex. Crim. App. 2019). After Franklin was convicted, he was sentenced to the mandatory sentence of life without the possibility of parole. Citing Section 12.31 of the Texas Penal Code, Franklin appealed, maintaining "that the age of a defendant at the time of an offense is an element of the offense that must be proven by the State." *Id.* "He seems to be claiming that the evidence is insufficient to support his sentence of life without parole because the State had the

---

[17]In *Jones*, the United States Supreme Court also held that such facts must be alleged in the indictment. *Jones*, 526 U.S. at 252 (holding that the carjacking statute in question created "three separate offenses by the specification of distinct elements, each of which must be charged by indictment, proven beyond a reasonable doubt, and submitted to a jury").

burden of proof as to his age and failed to meet that burden."[18]  *Id.* at 385.  Noting that it was

tasked with construing Section 12.31, the court held,

> A review of the statutory text makes clear that the language relating to age does not prescribe an element of a capital murder offense but is a matter relating to punishment.  The age of the offender comes into play only after he has been "adjudged guilty of a capital felony," and the statute says that such an offender shall be "punished by" a certain amount depending on his age at the time of the offense.  These quoted phrases signify a punishment matter. . . .

> The remaining question is whether the age is a punishment enhancer, and so, an element from a constitutional perspective that has to be proven by the State beyond a reasonable doubt.  Appellant contends that it is, but we disagree.  The United States Supreme Court has held that the State may "choose[] to recognize a factor that mitigates the degree of criminality or punishment" without being required "to prove its nonexistence."  We have followed this holding, concluding that the United States Constitution does not require the State to bear the burden of proof on an issue that, if answered affirmatively, would reduce, rather than increase, the sentence.  If being under age 18 is a fact that reduces the otherwise applicable sentence, then a statute can place the burden of proof on the defendant to show that fact without violating the Constitution.

*Id.* at 387 (alteration in original) (footnotes omitted) (citations omitted).

The court then went on to analyze the interaction between Sections 8.07(c) and 12.31(a)

of the Texas Penal Code.  *Id.* at 388.  Section 12.31(a) states that, when the State is seeking the

death penalty, the maximum sentence is death and the minimum sentence is life without parole.

TEX. PENAL CODE ANN. § 12.31(a).  Section 8.07(c) states, "No person may, in any case, be

punished by death for an offense committed while the person was younger than 18 years."  TEX.

PENAL CODE ANN. § 8.07(c).  The court first noted that Section 8.07 is found in Chapter 8,

entitled "General Defenses to Criminal Responsibility[,]" and that particular section is

"unambiguously worded as a punishment exemption."  *Franklin*, 579 S.W.3d at 388.  Because

---

[18]As in *Franklin*, we will consider Salazar's argument as one relating to the sufficiency of the evidence.

Section 8.07 is not "labeled as an affirmative defense, it should be treated like a defense, which means the defendant has the burden to produce evidence supporting the defense, and the State has the burden, once that is done, to disprove the defense beyond a reasonable doubt." *Id.* (footnotes omitted) (citations omitted). The court reasoned,

> "If being under age 18 is a defensive issue to the death penalty as a punishment, then logically, it would also be a defensive issue as to the lesser punishment of life without parole. The idea is that being under age 18 makes one *less* culpable; it would make[] no sense to make it *more* difficult to show the age exemption when the punishment exposure (death) is greater."

*Id.* Concluding that the issue of age in Section 12.31 was a defensive issue, the court held that Franklin had the burden to prove that he was under the age of eighteen at the time of the offense. Because he failed to do so, his sufficiency claim was overruled. *Id.* at 389.

In his brief, Salazar refers to *Franklin*, and he concedes that the *Franklin* court noted that *Apprendi* did not apply to cases consisting of facts such as this one. "This is clearly a strong argument in opposition to Salazar's position in this issue and in favor of the State's argument that *Apprendi v. New Jersey* is inapplicable." Yet, he goes on to argue that "this is clearly an important constitutional issue and it is not as resolved as it might appear initially." Noting that the *Franklin* court determined that the burden of proof fell on the defendant regarding the issue of age, Salazar posits, "But if that's permissible, what would prevent a legislature from imposing the maximum punishment for ALL criminal offenses and placing the burden on the defendant to establish the applicability of any punishment mitigation facts[?]"

Salazar's reading of *Franklin* appears to be too broad. As explained above, according to *Franklin*, had Salazar wished to show that he should receive a lesser punishment based on his

27

age, he had the burden to prove that he was younger than eighteen years old at the time of the offense. He did not do that.

Furthermore, in the punishment phase of trial, which occurred around the third week of January 2022, Salazar testified that he was twenty-two. The wreck occurred on January 13, 2021. Clearly, Salazar was over eighteen years of age at the time of the offense. Consequently, Section 12.31(b)(1) was not even applicable to Salazar, and we find his argument to the contrary to be without merit.

Accordingly, we overrule Salazar's fifth point of error.

## III. Conclusion

We affirm the trial court's judgment.

Scott E. Stevens
Justice

Date Submitted:     June 28, 2022
Date Decided:      October 7, 2022

Do Not Publish

28